UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| DANIEL H. OLIVER, | ) | Civil Action No.: _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SONOCO PRODUCTS COMPANY, | ) | **COMPLAINT** |
| SONOCO BENEFITS COMMITTEE OF | ) | |
| THE SONOCO PENSION PLAN FOR | ) | **(JURY TRIAL DEMANDED)** |
| INACTIVE PARTICIPANTS, THE | ) | |
| SONOCO PENSION PLAN FOR | ) | |
| INACTIVE PARTICIPANTS, AND | ) | |
| ALIGHT SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

1.     Plaintiff Daniel H. Oliver, individually, and as beneficiary of the Sonoco Pension Plan for Inactive Participants, brings this action under 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) as well as pursuant to claims for negligent misrepresentation, conversion, and equitable estoppel against Defendants Sonoco Pension Plan for Inactive Participants ("the Plan"), Sonoco Benefits Committee of the Sonoco Pension Plan for Inactive Participants ("the Benefits Committee"), Sonoco Products Company ("Sonoco") (hereinafter together referred to as the "Sonoco Defendants") and Alight Solutions, LLC ("Alight") (the Sonoco Defendants and Alight collectively referred to as "Defendants") for failure to provide a substantive right to Oliver under the Plan and for breaches of fiduciary duty and prohibited transactions under ERISA.[1]

2.     The most fundamental duty of ERISA plan fiduciaries is a duty of complete loyalty, under 29 U.S.C. § 1104(a)(1)(A)-(B), to ensure that they discharge their duty "solely in the

_____

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

interests of the participants and beneficiaries," and to "exclude all selfish interest and all consideration of the interests of third persons." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 546-47 (S.D. Tex. 2003).

3.      Defendants failed to pay Oliver his benefit in the form of a lump sum as provided under the terms of the Plan. Defendants cancelled Oliver's lump sum benefit for Sonoco's own financial gain and to avoid payment of penalties and other repercussions arising from Defendants' obligations to other third parties during the Plan's termination.  Defendants made material misrepresentations and omissions regarding Oliver's lump sum benefit upon which Oliver, along with his ex-wife Tammy Eckel, relied to their detriment. Defendants' wrongful cancellation of Oliver's lump sum benefit could have been avoided if Defendants had acted in Oliver's exclusive and best interests and properly advised him of the Plan's position with respect to the effect of Eckel's draft QDRO on Oliver's lump sum election.

4.      To remedy the Plan's wrongful denial of benefits and breaches of fiduciary duties, Oliver brings this action to recover the payment of his pension benefit in the form of a lump sum and seeks equitable or remedial relief for himself as the Court may deem appropriate, including the award of attorney's fees, costs, and expenses and prejudgment interest incurred in pursuing this action.

## JURISDICTION AND VENUE

5.      **Subject-matter jurisdiction.**  This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).

6.      **Venue.**  This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where the Plan is or was administered,

where at least one of the alleged breaches took place, or where at least one defendant resides or may be found.

7.  **Standing.**  Plaintiff has standing because an action under 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) allow individual Plan participants and their beneficiaries to recover for harms done to them by the Plan and Plan Administrator.

8.  Plaintiff, as Plan Participant and Beneficiary, was harmed when Defendants denied payment of his benefit in the form of a lump sum.

## PARTIES

9.  Sonoco Products Company was founded with a team of twelve employees in 1899 as the Southern Novelty Company in Hartsville, South Carolina. Later renamed, Sonoco Products Company, Sonoco employs over 19,000 employees working in approximately 300 operations in 34 countries, serving some of the world's best-known brands in some 85 nations.  Public records show that in 2021, Sonoco's net sales registered over $5.2 billion.  Sonoco is incorporated in South Carolina, and maintains its headquarters in Hartsville, South Carolina.

10.  Following a vote by the Board of Directors in July 2019, Sonoco voted to establish the Sonoco Pension Plan for Inactive Participants (the "Plan") on September 30, 2019, a frozen defined benefit plan, designed to provide payment of certain benefits under a predecessor plan called the Sonoco Pension Plan.  Therein, the Plan provided for its termination and transfer of the Plan's assets, liabilities, and obligations to a group annuity provider, or pay participants in the form of a lump sum. As part of the Plan's termination, the Plan stated:

> As soon as administratively feasible, . . . [m]embers shall receive their benefits in the form of a lump sum pursuant to a one-time election as described in Section 5.13, or through the purchase of irrevocable commitments from an insurance company. . . . Distributions shall be made within the time period for distributions under such standard termination requirements.

3

Section 1.4 of the Plan.

11.    As of December 19, 2019, the Plan had $1.3 billion in assets, and in terminating the Plan, Sonoco paid lump sums to about 2,250 participants totaling about $488 million in Plan liabilities in all.    Sonoco purchased group annuity contracts for the remaining 8,300 Plan Participants from Athene Annuity & Life Co. and Athene Annuity & Life Insurance Co. of New York (collectively referred to as "Athene"), and thus transferred the liability and responsibility for payment of Plan Participant benefits to Athene.

12.    The Sonoco Benefits Committee is the Plan Administrator of the Sonoco Pension Plan for Inactive Employees, responsible as a fiduciary for the general administration of the Plan and resolving questions concerning the Plan.    The Committee shall consist of at least three, but not more than seven individuals who will serve as members of the Committee by virtue of their job titles, as specified in a resolution adopted by the Board.

13.    Per the Plan's terms, the Sonoco Benefits Committee was permitted to and in fact delegated responsibility for the day-to-day record keeping and other administrative services related to the Plan's termination to a third-party administrator, Alight Solutions, LLC ("Alight").

14.    Alight is incorporated in the State of Illinois with its headquarters in Lincolnshire, Illinois. Alight advertises itself as a "sophistication pension plan administrator," having a "deep expertise" in ensuring that "plan[s] are successfully, executed, managed and delivered to a diverse workforce."

15.    Alight, having been delegated the day-to-day recording keeping and other administrative services related to the Plan, also had a fiduciary duty to act for Plaintiffs' exclusive benefit, and avoid making any material misrepresentations or omissions regarding benefits to any Plan participant's detriment.

4

16.    Athene Annuity & Life Assurance Company is the company to which Sonoco transferred approximately $900 million of its pension plan obligations on or about June 24, 2021, by purchasing group annuity contracts for approximately 8,300 Plan participants who did not elect to receive their benefit in the form of a lump sum.

17.    Daniel H. Oliver ("Oliver") resides in Hartsville, South Carolina, and was an employee of Sonoco for forty-four years and eight and one-half months, retiring on June 1, 2020, and awarded forty-five years of service.  He is a participant in the Plan under 29 U.S.C. §1002(7) because he is eligible to receive benefits under the Plan, his particular benefit accruing through and vesting on December 31, 2018, when the Plan was frozen and became eligible to receive a distribution from the Plan upon his retirement "based on the distribution forms available under the Plan."

18.    Tammy Eckel f/k/a Tammy Oliver ("Eckel") resides Myrtle Beach, South Carolina. She is an alternate payee of the Plan under 29 U.S.C. § 1056(d)(3), as she is Oliver's former spouse, and by a domestic relations order entered on September 28, 2006, was awarded a portion of any pension benefit paid to Oliver under the Plan. While not a party to this lawsuit, Eckel is an interested party, who equally seeks to have the portion of Oliver's pension benefit awarded to her in the 2006 domestic relations Order paid in form of lump sum.  By modification of Oliver and Eckel's divorce decree dated June 20, 2022, Eckel and Oliver clearly state:

> If the Plan, Plan Fiduciary, Plan Sponsor, or Sonoco Products Company raises any issue with the Parties receiving this benefit and award in the form of a lump sum through the Qualified Domestic Relations Order procedures, then [Eckel] agrees to forego any right to receive a portion of [Oliver's] pension benefit from the Plan, Plan Fiduciary, Plan Sponsor, or Sonoco Products Company, and agrees that [Oliver] shall receive his benefit in full from the Plan as a lump sum, without regard to any potion of that benefit herein awarded to [Eckel].

## ERISA'S FIDUCIARY STANDARDS

19.    Under the Plan, fiduciaries, like the Plan Administrator and Alight that exercise any authority or control over plan assets must act prudently and for the *exclusive* benefit of participants in the plan. 29 U.S.C. §1103(c)(1).

20.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [F]iduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of providing benefits to participants and their beneficiaries; and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

29 U.S.C. §1104(a)(A)(1)(A)–(B).

21.    Fiduciaries cannot act for the benefit of third parties or themselves.

22.    A fiduciary must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." Typically, therefore, the fiduciary must act in accordance with the plan documents, its amendments, SPDs, and other formally issued plan documents.

23.    When a fiduciary is aware of the plan participant's circumstances, moreover, the fiduciary has a duty to provide complete and correct material information even if that requires conveying information about which the beneficiary did not specifically inquire.

24.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

## BACKGROUND FACTS

### SONOCO'S SELF-FUNDED EMPLOYER PLAN WAS ADMINISTERED UNDER AN INHERENT CONFLICT OF INTEREST

25.     With a defined benefit plan, an employer's assets are at risk. A defined-benefit plan is an employer-funded retirement plan where employee benefits are computed using a formula that considers several factors, such as length of employment and salary history. The employer typically funds the plan by contributing a regular amount, usually a percentage of the employee's pay, into a tax-deferred account.  The company is then responsible for managing the plan's investments and its assets are ultimately at risk.

26.     Sonoco, the employer, was responsible for funding the Plan in this case and to satisfy its commitments to employees, bearing all investment risks.

27.     The Sonoco Benefits Committee was appointed as Plan Administrator by resolution of the Sonoco's Board of Directors.

28.     Under these circumstances, where Sonoco both resolves benefit claims and pays claims, the Plan Administrator operates under an inherent conflict of interest.

29.     The Plan's fiduciaries, moreover, have control over the administration of benefits to Plan participants and are responsible for hiring, training, supervising, and monitoring administrative service providers, like Alight.

30.     To the extent the Benefit Committee delegated any fiduciary duty to Alight in the administration of the Plan, then Alight also was a fiduciary to the Plan in carrying out those duties.

7

**DEFENDANTS CONFIRMED THAT OLIVER PROPERLY ELECTED PAYMENT OF HIS PENSION BENEFIT IN THE FORM OF A LUMP SUM**

31.    Oliver was a long-standing, faithful employee of Sonoco, who worked at the company for forty-four years and eight and a half months from 1975 until 2020, retiring on June 1, 2020, and awarded forty-five years of service.

32.    Oliver has been a participant in the Plan since 1983. Oliver's benefit accrued through and vested on December 31, 2018, when the Plan was frozen, and Oliver became eligible to receive a distribution from the Plan upon his retirement on June 1, 2020.

33.    Under section 5.13 of the Plan, Oliver was entitled to elect that his benefit be paid to him in the form of a lump sum so long as made during the period "designated by the plan administrator . . . in the form and manner directed by the plan administrator." Defendants state that the form and manner directed by the Plan Administrator was "based on the distribution forms available under the Plan."

34.    This lump sum election was offered and promised by the Plan as an alternative to having the benefit transferred to and paid out as an annuity by Athene as part of the Plan termination. As stated by the Plan Administrator in literature sent to the Plan participants:

> You will not lose any part of your vested benefit(s) as part of the Plan termination. Instead (sic) you will have several choices on how you would like your Benefits paid. . . . You will be given an opportunity to elect to receive your pension benefits as an immediate annuity or in a lump sum.

35.    Based on the distribution forms provided by the Plan, Oliver elected to receive his retirement benefit as a lump sum under the Plan.

36.    On March 9, 2020, Sonoco Benefits Center mailed Oliver a "Notice of Plan Benefits," reminding Participants in the Plan that Sonoco Products Company had approved the termination of the Plan, that Oliver's benefits were frozen in 2018 as part of that process, and that

"the benefit(s) you've earned as of that date belong to you. You will not lose any part of your vested benefit(s) as part of the Plan termination. Instead (sic) you will have several choices on how you would like your Benefits paid."

37.    The Notice further informed Oliver that "you will be given an opportunity to elect to receive your pension benefits as an immediate annuity or in a lump sum."

38.    The Notice of Plan Benefit also included a "Personalized Pension Benefit Statement." Under the more specific heading, "Lump Sum Considerations," the Statement stated:

> The next step in the Plan termination is to provide a lump sum value and give you the opportunity to make an election to defer your benefits, receive an annuity, or receive a lump sum. The Lump Sum amount will be determined and communicated to you when the Plan termination distribution date is known.

39.    Under the heading "Purchase of Annuity Contract," the Statement stated: "If you elect an immediate or deferred annuity, your monthly benefit(s) will be transferred to an insurance company."

40.    Under the heading "Important Notice," the Statement stated: "Your estimated benefit amounts shown under this Notice are based on data we have on file. The actual benefit amounts paid to you may vary from this estimate due to data corrections and the eventual distribution date."

41.    Further, the Notice stated: "[o]ur records indicate your pension benefit is not subject to a [QDRO]. If you are aware that such an order exists and applies to your pension benefit(s), please provide a copy of the order by contacting the Sonoco Pension Transition Center as soon as possible."

42.    At that time, Oliver's pension benefit was not subject to a qualified domestic relations order.

43.    On May 29, 2020, moreover, when Oliver called regarding his benefits, he spoke with Representative Jesse. Oliver told him that he was retiring from Sonoco on this day and that he wanted to set up his pension benefits. Representative Jesse asked Oliver if he was legally married. Oliver responded that he was divorced. The representative asked if Oliver had been divorced for less than a year. Oliver stated he had been divorced for approximately twelve years. The representative then told Oliver that "as long as it is not less than a year, then we should not need any documentation regarding your divorce."

44.    In June 2020, Oliver spoke with a representative and explained that he wanted to wait until the following year to make a pension election because he had read that Sonoco was going to offer a buyout on the pension the following year. The representative informed him that he could "defer" his pension.

45.    On January 25, 2021, Sonoco wrote Oliver to inform him that action needed to be taken by March 19, 2021, to elect how he would receive his vested benefits under the Plan. The letter presented two relevant choices: (1) begin monthly pension payments in the amount of $3,690.32 payable as a Single Life Annuity, or (2) take a one-time lump sum payment now in the amount of $716,366.13, both to begin in May 2021.

46.    As to "[h]ow to make your election," the January 25, 2021 letter instructed Oliver to request a "commencement kit including all the benefit options payable to you, the Notice of Rights and other important disclosures." The letter warned, "After you start your benefit, you cannot change the payment option. . . . Valid signed authorization forms must be received by March 31, 2021."

47.    On February 18, 2021, Sonoco mailed Oliver a "Pension Calculation Statement," noting that he "must choose one of the options below," which included payments as of May 1,

2021, in the form of a lump sum or single life annuity. The notice further provided that the lump sum payment would be in the amount of $716,366.13, and the single life annuity would be paid as a monthly benefit in the amount of $3,690.32.

48.    A document entitled "Starting Your Pension Benefit," also dated February 18, 2021, explained: "Starting your pension benefit is a two-step process. First, you will make your choices. Second, you will confirm your choices by signing the Pension Election Authorization Form." The document further states: "In order to receive your payment on May 1, 2021, you'll need to make your choices by March 19, 2021. If you don't make your choices by this date, your pension payment may be delayed."

49.    Further, after making the choices, "[a] Confirmation of Pension Choices and Pension Election Authorization Form will be mailed to you," and must be returned signed and dated "by March 31 to the Sonoco Pension Transition Center," to receive your payment on May 1. As to what to do, the "Starting Your Pension Benefit" document made clear that Participants must make choices by March 19, 2021, and then sign, date, and return the "Pension Election Authorization Form" no later than March 31, 2021.

50.    A "Notice of Rights" document also dated February 18, 2021, explained that Participants had thirty days to think about their benefit choices, with the 30-day period beginning on the day of receipt of the Notice of Rights. The Notice of Rights further instructed, "don't return the Pension Election Authorization Form until you've had . . . time to consider your pension benefit choices. After you start your benefit, you cannot change the payment option."

51.    As instructed, Oliver timely made his choice for a lump sum payment and received the "Pension Election Confirmation Statement," which "confirms [his] pension benefit choices for the Sonoco Pension Plan for Inactive Participants that [he] made on February 18, 2021," including,

each as separately stated factual affirmations, that: (1) the Pension Payment Option would be in Lump Sum; (2) the amount payable would be $716,366.13, and that taxes would be deferred for the benefit that was rolled over;  (3) the benefit would be received May 1, 2021, and that the rollover payment was to be sent in the amount of $716,366.13 to Edward Jones at 106 Orange Street Darlington, South Carolina 29532 at Account Number xxxx5426 and Rollover Type was Traditional IRA; and (4) there would not be any federal or state income tax withholdings. Importantly, the Plan stated: "In order to begin your benefits, you must sign and return the enclosed Pension Election Authorization Form(s)."

52.     As to the Pension Election Authorization Form, again the Plan reiterated, "You must sign, date, and return this form to begin your pension benefit."

53.     Oliver successfully submitted Pension Election Authorization Form on February 19, 2021, and therein attested by his signature below that he chose "Lump Sum to begin on May 1, 2021," and separately affirmed that "this payment option pays $716,366.13."

54.     Sonoco Benefits Resource Center emailed Oliver a few days later, on Monday, February 22, 2021, affirming that "Your Authorization is Complete . . . You've successfully authorized your pension choices. Your lump-sum pension payment will be issued as soon as administratively possible.  More information will be sent to you once we know your actual payment date."

55.     About a month later Oliver spoke to a representative, Representative Robert, on March 17, 2021.  This representative also confirmed that Oliver had properly elected to receive his pension benefit in the form of a lump sum, stating: "I see here that you turned in your pension election authorization form and it was approved, so that you've done everything you need to do on your end in order to complete the commencement process."  This representative then told Oliver

that he would be receiving a check around the middle of May.  Oliver reiterated, "So everything

as far as what I need to do is already been done," and Representative Robert stated: "Yes, sir, you

got it."

### ECKEL SUBMITTED A DRAFT QDRO WELL BEFORE THE BENEFITS COMMENCEMENT DATE FOR THE LUMP SUM WINDOW BEGAN OR THE PLAN ASSETS WERE TRASFERRED TO ATHENE PURSUANT TO THE PLAN TERMINATION.

56.     According to the Plan, Eckel submitted a draft QDRO for approval on March 25,

2021. She had never attempted to qualify the pension benefit awarded to her in Plaintiffs' divorce

decree before then.

57.     The draft QDRO was submitted to the Plan before the election of benefits period

ended on March 31, 2021, and well before the benefits commencement date for the lump sum

window began on May 1, 2021, or the Plan assets needed to be transferred to Athene according to

the Plan's termination timeline on June 24, 2021.

### DEFENDANTS FAILED TO ADVISE OLIVER AND ECKEL THAT ANY ISSUE WITH THE QDRO NEED BE RESOLVED BEFORE A PARTICULAR TIME OR ELSE JEOPARDIZE OLIVER'S RIGHT TO RECEIVE THEIR BENEFIT IN THE FORM OF A LUMP SUM.

58.     During this time, Defendants never communicated to Oliver and Eckel that the draft

QDRO would have any ill effect on Oliver's lump sum election if Oliver and Eckel did not act

within a certain amount of time to qualify it.

59.     Defendants failed to advise Oliver of their position that the lump sum election was

in jeopardy, despite being asked directly by Oliver during this time to assist him in resolving any

issue with the draft QDRO so that he could be paid his lump sum.

60.     On April 8, 2021, Sonoco issued a Domestic Relations Order Denial Notice, explaining that the draft order could not be approved because it did not clarify correctly how to value the alternate payee's share of the Plan benefit, and advised:

> The Qualified Order Center has received a domestic relations order for the participant named above [Oliver]. We have *restricted* the benefits under the participant's retirement plan mentioned in the order. . . . We can't take any further action until we receive a revised order. . . . The employer's QDRO procedures document offers more details about the qualification process, such as . . . *Benefit Activity Restrictions*."

61.     The QDRO Procedures attached to the April 8, 2021 Domestic Relations Order Denial Notice further provided that "[t]he retirement plan administrator will start the process to prevent the participant from withdrawing money, which otherwise may be payable to the alternate payee if the order is approved as a QDRO." Moreover, it stated:

> If benefits are already being paid to the participant or become payable during the QDRO process, the defined benefit plan administrator will suspend the benefit payments in the amount specified in the order. The suspension lasts until the order is qualified or for a maximum period of 18 months per order. When the order is qualified, the suspended amount will be paid retroactively to the alternate payee.

62.     There is no indication in either of these communications that Defendants considered the draft order to have any voidable or cancelling effect on Oliver's lump sum election or warning of the same if Oliver and Eckel failed to resolve any issue related to the draft QDRO before the Benefits Commencement Date for Lump Sum Payments, or the transfer of assets to Athene pursuant to the Plan termination.

63.     On April 23, 2021, moreover, the Plan calculated the value of Plan assets for group annuity candidates who were quoting the cost of purchasing group annuity contracts for those who did not elect to receive their benefit in the form of a lump sum. Upon information and belief, in

that valuation the Plan excluded Oliver's lump sum as the Plan only unilaterally cancelled Oliver's lump sum payment in their internal system on May 26, 2021.

64.     Upon information and belief, moreover, the Benefits Commencement Date for the Lump Sum Window began on May 1, 2021.

65.     By the middle of May 2021, Oliver had not heard anything about his lump sum payment and became aware that other participants in the Pension Plan had received their lump sums.

66.     When Oliver called Sonoco Benefits Center to inquire on the status of his payment, the Benefits Center simply told him that there was an issue with Oliver's ex-wife's QDRO and that he could not be paid his benefit until the issue was resolved.

67.     On May 25, 2021, a Sonoco Benefits representative named Rhonda confirmed that "everything has actually already been approved, your authorization form was approved, your benefit commencement day was on May 1st but for some reason the payment still has not been set up, so [she will] have to do is create a ticket for our Plan Management Team, I'm not sure uh what happened or why the payment didn't get set up." This representative even allegedly elevated the issue to management.

68.     When Oliver specifically asked Representative Rhonda more about the resolution of the issue with the QDRO, this representative further assuaged Oliver not to worry, stating: "I am not showing information on your account with regards to a QDRO, I'm just showing that your authorization form has approved and your commencement date was May 1st but they haven't set up the payment yet, so uh, what I'm gonna have to do is create a ticket so that our back office can grab this and go ahead and get your payment set up since we are past your commencement date."

**ACTING IN THEIR OWN SELF-INTEREST AND WITHOUT ANY POWER TO DO SO UNDER THE PLAN TERMS OR THE LAW, DEFENDANTS CANCELLED OLIVER'S LUMP SUM ELECTION.**

69.     Upon information and belief, the Plan vacated Oliver's lump sum election on May 26, 2021, without any notice to him and in complete disregard of every prior representation it had ever made to Oliver regarding his lump sum election.

70.     Other than making this bald allegation regarding cancellation, however, the Plan has never provided any written notice or confirmation to Oliver regarding the same.

71.     On June 1, 2021, the Plan terminated and transferred its remaining assets to Athene on June 24, 2021, releasing approximately $900,000,000.00 of pension liabilities from Sonoco's balance sheet.

72.     In cancelling Oliver's lump sum election, Defendants acted in their own self-interest, disregarding their duty to act solely in the interest of Plan participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries.

73.     Upon information and belief, the cost of transferring Oliver's pension benefit to Athene as a single-life annuity was far less expensive for the Plan than paying him in the form of a lump sum.

74.     Moreover, upon information and belief, any assets remaining in the Plan's 401(h) account after termination would be transferred from the Plan to "Sonoco Pension Plan's 401(h) account and used to provide postretirement health benefits for participants who will have retired under either plan (and their eligible spouses and dependents) and for related administrative expenses" or used by Sonoco for other purposes to its own advantage.

75.     Upon information and belief, Defendants' cancellation of Oliver's lump sum election avoided the Plan monetary penalties and other repercussions related to failing to pay

timely all those who had elected to be paid in the form of a lump sum and transfer all Plan assets to Athene by June 24, 2021.

76.     The Plan's conduct harmed Plaintiff.  A lump sum payment is far more valuable to them than payment in the form of a single-life annuity.

### MONTHS AFTER THE PLAN TRANSFERRED ITS ASSETS TO ATHENE, DEFENDANTS CONTINUED TO REPRESENT THAT IT WOULD PAY OLIVER HIS BENEFIT IN THE FORM OF A LUMP SUM

77.     The Plan publicly represented that it had purchased annuities for all Plan participants who (1) either elected to receive their benefits in the form of an annuity or (2) did not make any election and then transferred the administration of these benefits to Athene.

78.     Oliver falls in neither of these categories, the Plan having confirmed in writing in February 2021 that he made an election to receive his benefit in the form of a lump sum.

79.     In fact, until October 2021, the Plan never informed Oliver in writing of any circumstance to the contrary.

80.     The denial of the QDRO on April 8, 2021 only instructed Oliver that his lump sum had been "restricted."

81.     Restricted does not mean "cancelled" or "nullified."

82.     Even after allegedly cancelling his lump sum benefit on its internal system, an action for which the Plan has never provided written documentation of the same, the Plan still failed to send Oliver any written notice of its action.

83.     Instead, for months, the Plan continued to represent to Oliver that it, not Athene, would and could process and pay out his pension benefit, and even promised that this benefit would be earning interest while the issue related to the draft QDRO was outstanding.

84.     From June through September 2021, Oliver contacted Alight on more than a dozen occasions in inquire on the status of his pension benefit.  During these calls, he was repeatedly assured that the QDRO submitted by Eckles was holding up his payment and, once resolved, his payment would be "released" and he would receive the lump sum payment that he elected.  During several of these calls, Oliver indicated that he was expecting his benefit in the form a lump sum. The Alight representatives with whom he spoke never indicated that his lump sum election had been cancelled and instead made numerous comments indicating that the lump sum payment was forthcoming.  One representative even indicated that his lump sum payment was accruing interest while the QDRO issue was being resolved.

85.     On every occasion with which Defendants had to speak with Oliver, Defendants failed to convey that Oliver would be paid in any form other than a lump sum or would have to make another election to start his benefit to be paid for that matter.

86.     In any event, the only benefit that the Plan was ever authorized to process and pay any Plan participant pursuant to the Plan's termination was in the form of a lump sum.

87.     Certainly, the Sonoco Benefits Center had no authority to process for payment Oliver's alleged single-life annuity with Athene.

88.     On September 15, 2021—months after the Plan's June termination and transfer of benefits to Athene for participants who did not make lump sum elections—Oliver spoke with another Alight representative, who incorrectly informed Oliver that "Sonoco has just been bought out by Athene so they now cover your um pension account and I am going to get you over to them so they can go over your benefits with you."

89.    Soon thereafter, Oliver spoke to Chris Moss, Senior Manager of Employee Benefits for Sonoco and member of the Sonoco Benefits Committee for the Plan, who informed Oliver for the first time that his benefit had been transferred to Athene and become a single-life annuity.

**DEFENDANTS' CANCELLATION OF OLIVER'S LUMP SUM BENEFIT IS NOT SUPPORTED BY ANY PLAN TERMS OR LAW AND THEIR EXCUSES THROUGHOUT THE FORMAL COMPLAINT PROCESS HAVE BEEN CONCLUSORY, CONTRADICTORY, AND EVOLVING**

90.    Oliver, by and through the undersigned, then mailed a letter requesting that Sonoco investigate what had happened to Oliver and honor his lump sum election.

91.    Upon information and belief, Moss then undertook an investigation into the matter. In an internal email from Denise Pallavajjala, who is a Defined Benefit Client Leader and Alight lump-sum window project manager, to Chris Moss on October 22, 2021, stated: "Chris, Yes, we talked about him before, a QDRO was added to his account in March, he was transitioned to Athene with the QDRO pending . . . . Since the DRO was submitted, it halted any retirement processing."

92.    Moss responded without much scrutiny, "Well, that's a good explanation!"

93.    After reviewing some more information, Moss further emailed Pallavaijala, revealing that Defendants never intended to rectify their failures for Oliver, a faithful employee with more than forty decades of service, and sought to justify the means by any measure and without regard to full consideration of the facts:

> I need to let the lawyer know in no uncertain language that no order was on his account and then the new order was received, after the [Lump Sum Window] closed. Therefore, the lump-sum could not be paid. . . . The customer calls are secondary, so just dates and brief, brief, summaries are all I need. Nothing can be done and any miscommunications can't be undone, but I will probably have to apologize. Doesn't change the outcome.

94.    On November 1, 2021, moreover, Pallavajjala admitted failures on the Plan's part:

"I see opportunities for our team and feedback has been given . . .", including

> When [Domestic Relations Order] restriction was placed on [Oliver's Defined Benefit] record, QDRO team could have sent notice to [Defined Benefit] admin team to cancel pending commencement (we caught it later in pre-payment checks);
>
> When [Defined Benefit] admin team cancelled pending payment, another outreach could have been sent [to Oliver];
>
> Given volume of calls [from Oliver], this should have been escalated to see how we could assist him to understand restriction;
>
> To the [Qualified Domestic Relations Order] team that for any benefit sent to Athene, we should no longer be reviewing [Domestic Relations Orders].

95.    Further, after this exchange with Pallavajjala, Moss responded to the undersigned's

inquiry regarding Oliver's lump sum election and explained in a conclusory fashion:

> [T]he bottom line is that [Oliver]'s ex-wife presented a domestic order for the first time after he made his lump-sum election. Therefore, we could not commence his payment until the final, signed order is received. . . .
>
> Attached is the draft [qualified domestic relations] order received by our record keeper on March 25, 2021. Because no order was on file prior to receipt of this order on March 25, [Oliver] was able to elect the lump-sum payment option during the special, one-time election period held from February 1 to March 19, 2021. However, the commencement date for the lump-sum payments was May 1, 2021, with actual payments made mostly on May 14. Since the draft order was received on March 25, we had no choice but to vacate his lump-sum election and place a hold on withdrawals until the order was qualified and a final court order received by the plan.
>
> While I understand [Oliver]'s frustration with the customer service he received from the Benefits Center, orders are extremely complicated and sometimes require quite a lot of back-and-forth to get the order in the correct language and the final benefits calculated. Presenting the draft order for the first time prior to the lump-sum payment stopped his payment and, consequently, an annuity at Athene was purchased for him when the Sonoco Pension Plan for

Inactive Participants was terminated. . . . There is now no opportunity to receive a lump-sum payment of his former pension benefits.

96.    Upon further question and inquiry, Moss further stated:

A lump sum distribution is no longer available to Mr. Oliver because the restriction on Mr. Oliver's Pension Plan benefits was not removed as of the close of the limited lump sum window opportunity period (March 31, 2021). Instead, Mr. Oliver's Pension Plan benefit, and the Pension Plan benefits of all other participants, beneficiaries and alternate payees who did not receive a lump sum distribution, were transferred to an annuity provider as the final step in the termination of the Pension Plan. The Pension Plan is now terminated.

97.    In response to the undersigned's further question, "On what date did Sonoco vacate Mr. Oliver's lump-sum election?", Moss responded:

When the draft order was received in 3/25, a restriction was placed on his account against any payment commencement. The order was reviewed and denied, then a second order was received on 6/15 and the language was approved. Once approved, the lump-sum payment was cancelled. . . . The restriction was placed on his account 3/26 after the draft order was received. This would prevent the lump sum from being paid.

98.    Contradicting this position in a later communication, Moss instead indicated that Oliver's lump sum was in fact "cancelled" or vacated in the Sonoco Defendants' internal system on May 26, 2022, not after the draft QDRO was approved in June.

99.    Then, contradicting themselves again, in denying Oliver's formal complaint, the Sonoco Defendants stated that his lump sum election was "nullified" by the law, not the Plan terms, at the time the draft QDRO was submitted to it.

100.    Similarly, the Sonoco Defendants at first pointed to Section 16.2 of the Plan for their authority in cancelling Oliver's lump sum election, but later, when responding to Oliver's formal complaint and appeal of the Benefits Committee's denial of the same, the Sonoco

Defendants admit that the Plan itself does not allow for nullification of the form of a Participant's

benefit, otherwise confirmed and properly made. Instead, the Sonoco Defendants claim that "[t]he

law, not the Plan, nullified the election" after the submission of the draft QDRO.

101.    The Sonoco Defendants, however, fail to cite to any law that supports their position.

102.    Ultimately, the Sonoco Defendants reiterate:

> When the information used to calculate a participant's benefit changes, a new Pension Calculation Statement and new Pension Election Authorization Form need to be completed. . . . Mr. Oliver and his ex-wife did not reach an agreement about what portion of Mr. Oliver's Plan benefit was to be assigned to his ex-wife prior to the date that the 2021 Limited Lump Sum Window Opportunity closed [in May 2021 as represented by Chris Moss in another letter] so Mr. Oliver did not have the option to make a new timely election under the 2021 Limited Lump Sum Window Opportunity.

103.    Defendants, however, never communicated this position to Plaintiff, and after

confirming Oliver's election to be paid in the form of a lump sum, they had a duty to do so.

104.    Had Defendants acted in the exclusive interest of Plaintiff and with the sole purpose

to provide Oliver his lump sum benefit, Oliver and Eckel could have taken steps to resolve the

issue timely and be paid in the form of a lump sum.

105.    The Sonoco Defendants baldly concluded in their own self-interest during the

appeals process:

> Because third parties were involved and termination of the Plan pending, there was no opportunity to make special exceptions that would delay the time period [for making an election under the 2021 Limited Lump Sum Window Opportunity]. As a result, any Plan benefits that were not paid by May 2021, were transferred to Athene as the annuity provider in order for the Plan to terminate.

106.    Contrary to Defendants' bald assertions, there was no need to delay any time period

for making an election under the 2021 Limited Lump Sum Window Opportunity had Defendant

fully and accurately informed Oliver and Eckel about their position with regard to the effect of Eckel's draft QDRO on Oliver's lump sum election.

107.    Oliver and Eckel would have and could have simply withdrawn the draft QDRO to allow Oliver to take the benefit in full.

108.    Since reading Defendants' position during the administrative process, Oliver and Eckel have in fact modified their divorce decree to make this fact plain. Oliver and Eckel's divorce decree now states:

> If the Plan, Plan Fiduciary, Plan Sponsor, or Sonoco Products Company raises any issue with the Parties receiving this benefit and award in the form of a lump sum through the Qualified Domestic Relations Order procedures, then [Eckel] agrees to forego any right to receive a portion of [Oliver's] pension benefit from the Plan, Plan Fiduciary, Plan Sponsor, or Sonoco Products Company, and agrees that [Oliver] shall receive his benefit in full from the Plan as a lump sum, without regard to any potion of that benefit herein awarded to [Eckel].

**OLIVER EXHAUSTED HIS ADMINSITRATIVE REMEDIES WITH THE PLAN AND THIS MATTER IS RIPE FOR REVIEW.**

109.    Oliver made a formal Complaint to Defendant Sonoco Benefits Committee on November 23, 2021, requesting payment of his pension benefit in the form of a lump sum. The Benefits Committee responded on January 11, 2022, denying Oliver's claim. Oliver then appealed the denial of his Claim on March 11, 2022, and submitted an Addendum to the Appeal on May 2, 2022, after Defendants provided additional documents relevant to the matter. The Benefits Committee denied Oliver's appeal on May 10, 2022.

**CLAIM I: VIOLATION OF ERISA, 29 U.S.C. §1132(a)(1)(B) AGAINST THE SONOCO DEFENDANTS**

110.    Oliver repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

111.    The relevant section of ERISA provides that a "participant or beneficiary" of an employee benefit plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(B).

112.    Oliver is a participant in the Plan and made an election to have his benefit paid in the form of a lump sum during the period "designated by the plan administrator . . . in the form and manner directed by the plan administrator."

113.    Oliver, following the form and manner directed by the Plan Administrator, elected to receive his pension benefit in the form of a lump sum.

114.    Defendants confirmed Oliver's lump sum election, expressing in writing on February 22, 2021, that Oliver had "successfully authorized [his] pension choices," and promised that "[his] lump-sum pension payment will be issued as soon as administratively possible."

115.    ERISA specifically protects a participant's right to receive a lump-sum payment of benefits.

116.    According to the Plan's QDRO Procedures, moreover, the Plan should have paid to Oliver the lump sum to which he was entitled to on May 1, 2021, and suspended only the amount specified in the draft order. The benefits at issue in the draft QDRO order were notably only a small fraction of the Oliver's overall benefits, likely representing less than 5% of Oliver's vested benefits.

117.    As to the suspended amounts, the QDRO procedures contemplate payment of those accordingly, once an order is qualified, or provides for alternative ways to address the issue if the order is not qualified within eighteen months.

118.    As the QDRO procedures recognize, it is possible that Oliver's ex-wife may not have been able to have a court approve the draft order, for whatever reason, and therefore may not have been entitled to any of Oliver's lump sum election.

119.    Or, in the alternative, had Defendants informed Oliver and Eckel that they needed to qualify the draft order and complete other steps within a given amount of time, Oliver and Eckel could have done so, or, at the very least, withdrawn the draft QDRO and permitted Oliver to receive the pension benefit without regard to the portion of the pension benefit to which Eckel may have been awarded in the divorce decree.

120.    As reflected in Oliver and Eckel's modified divorce decree, Oliver and Eckel were willing and able to reach this resolution regarding Oliver's pension benefit.

121.    Instead, acting in their own self-interest and disregarding their fiduciary duties to act for the exclusive benefit of Oliver's lump sum election, Defendants cancelled Oliver's lump sum election.

122.    Defendants materially misrepresented that Oliver's lump sum election was secure and would be paid once any matter related to the draft domestic relations order was qualified.

123.    Defendants materially failed to share information relevant to protecting Oliver's lump sum election; that is, Defendants failed to inform Oliver and Eckel that Oliver's right to elect to be paid in the form of a lump sum was at risk if Oliver and Eckel did not resolve any issue with the draft QDRO within a certain time frame.

124.    Defendants' conduct in this regard has no place under the Plan terms or under the law and amounts to a wrongful denial of Oliver's right to be paid his benefit in the form of a lump sum under the Plan.

125.    Upon information and belief, the Sonoco Defendants funded Oliver's lump sum benefit.

126.    The Sonoco Defendants calculated the value of Plan assets for group annuity candidates who were quoting the cost of purchasing group annuity contracts for those who did not elect to receive their benefit in the form of a lump sum. At this time, the Plan excluded Oliver's lump sum from that value, as he was considered then among the Plan Participants who elected to receive their benefit in the form of a lump sum.

127.    The Benefits Commencement Date for Lump Sum Payments began on May 1, moreover, and most were paid by May 14.  Oliver's lump sum election was only cancelled on May 26. Therefore, the Plan funded Oliver's lump sum at least and until May 26. This amount was held in its Plan assets available for funding Oliver's benefit at least until the Plan transferred the assets to Athene on June 24 to purchase group annuity contracts for Plan participants who had elected to receive their benefit in the form of an annuity or who had made no election at all.

128.    Oliver was not among those for whom the Sonoco Defendants should have purchased an annuity, as he had elected to receive his benefit in the form of a lump sum and the Sonoco Defendants had confirmed his successful election of the same.

129.    The Sonoco Defendants never advised Oliver that they would be purchasing him an annuity instead of paying him in the form of a lump sum when they took action respecting his benefit contrary to their prior representations.

130.    Moreover, based upon the circumstances and timing outlined above, it is unclear whether the Plan even ever paid for Oliver to be included among the Plan participants to be provided an annuity within the group annuity contract purchase. Certainly, Oliver was not included in any quotation of the same.

131.    In any event, it cost the Plan far less to purchase Oliver a single-life annuity within the group annuity contracts, than to pay Oliver in the form of a lump sum.

132.    Any assets left in the Plan after termination was to be used to Defendants' own advantage.

133.    Furthermore, Defendants avoided penalties and other sanctions which can be associated with failing to pay out all benefits timely pursuant to the standard termination of a defined benefit Plan.

134.    For all the reasons provided above, Defendants were acting under a conflict of interest, in their own self-interest, and in derogation of their fiduciary duties to Oliver when they failed to provide him with his lump sum benefit provided under the Plan and to enforce the rights due to him under the terms of the Plan thereby violating ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B).

135.    Oliver was harmed by Defendants' conduct as receipt of a lump sum in an amount of $716,366.13 is worth far more to him and Eckel than receipt of the pension benefit in the form of a single life annuity.

136.    Oliver therefore seeks this Court to order the Sonoco Defendants to pay Oliver's pension benefit in the lump sum amount of $716,366.13, plus prejudgment interest, attorney's fees, costs and expenses.

**CLAIM 2: INJUNCTIVE RELIEF UNDER ERISA 29 U.S.C. §1132(a)(3) AGAINST THE SONOCO DEFENDANTS AND ALIGHT**

137.    Oliver repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

138.    Oliver is a participant of the Plan and is thus entitled to bring a civil action under ERISA, 29 U.S.C. §1132(a)(3), to enjoin any act or practice by the Plan that violates ERISA or

the terms of the Plan, or to obtain other equitable relief to redress such violations or to enforce any ERISA provision or the terms of the Plan.

139.    Oliver, following the form and manner directed by the Plan Administrator, elected to receive his pension benefit in the form of a lump sum. The Plan confirmed Oliver's successful election to receive his benefit in the form of a lump sum election in writing on February 22, 2021, and promised that it would be issued as soon as administratively possible.

140.    Upon information and belief, Defendants in fact funded the Plan assets with Oliver's lump sum of $716,366.13, and this amount was part of the Plan assets until the Sonoco Defendants transferred its Plan assets to Athene and used any remainder for its own financial advantage.

141.    ERISA specifically protects a participant's right to receive a lump-sum payment of benefits.

142.    Defendants owed a fiduciary duty to Oliver to act "solely in the interest of the [Plan] participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries."  29 U.S.C. §1104(a)(1)(A).

143.    Plan Administrators must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Id. § 1104(a)(1)(A)-(B).

144.    A fiduciary must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [Title I] or Title IV." Typically, therefore, the fiduciary must act in accordance with the plan documents, its amendments, SPDs, and other formally issued plan documents.

145.    When a fiduciary is aware of the plan participant's circumstances, moreover, the fiduciary has a duty to provide complete and correct material information even if that requires conveying information about which the beneficiary did not specifically inquire.

146.    Furthermore, Sonoco oversaw the overall governance of the Plan and had the authority to delegate any of its fiduciary responsibilities, including allocating such responsibilities to the Sonoco Benefits Committee of the Sonoco Pension Plan for Inactive Participants.

147.    To the extent any of the fiduciary responsibilities of the Sonoco Defendants were delegated to another fiduciary, such as Alight, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

148.    A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to administering and providing benefits under the Plan, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

149.    Alight, having been delegated the duty to administer and provide benefits under the Plan pursuant to the Plan's termination had a fiduciary duty to Oliver in all the ways described above.

150.    The Sonoco Defendants and Alight breached their fiduciary duties to Oliver, confirming that Oliver successfully elected to receive his benefit election in the form of a lump sum and would be paid out in May 2021 or as soon as any matter related to the draft QDRO was resolved.

151.    Furthermore, the Sonoco Defendants and Alight's QDRO procedures restrict only that portion of a Plan Participant's benefit that may be assigned to the alternate payee.

29

152.    The Sonoco Defendants have not paid Oliver any lump sum benefit.

153.    Instead, Defendants acted in their own self-interest and unilaterally cancelled Oliver's election for their own financial gain and to avoid penalties and default of other obligations to third parties related to the Plan's termination.

154.    The lump sum amount to be paid to Oliver was far less than the amount Defendants paid to purchase Oliver a single-life annuity within a group annuity contract, and any assets left in the Plan after its termination would be used for the benefit of Defendants.

155.    29 U.S.C. § 1106(b)(2) prohibits a Plan fiduciary from engaging in any transaction involving the Plan on behalf of a party such as Sonoco, the Employer, whose interests are adverse to the interests of Plan Participants.

156.    The Sonoco Defendants, moreover, breached their fiduciary monitoring duties by, among other things:

    a.    failing to monitor Alight, evaluate its performance, or to have a system in place for doing so, and standing idly by when addressing Oliver's claim for lump sum benefit;

    b.    failing to monitor Alight's fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the unreasonable lack of communication between the various departments within the Benefits Center and provision of inaccurate and misleading information to Plan Participants in violation of ERISA;

    c.    failing to ensure that the monitored fiduciaries, such as Alight, understood various aspects of the Plan relating to the lump sum election and any alleged effect of a draft QDRO pursuant to the Plan's termination, and that the monitored fiduciaries,

such as Alight, provided timely and accurate information to Plan Participants for the exclusive and sole purpose of protecting their Plan benefits; and

d.   failing to acknowledge and rectify mistakes in a timely and appropriate manner for the exclusive and sole purpose of protecting Plan Participant benefits, all to the detriment of Oliver's lump sum election.

157.    Under such circumstances as those described above, Defendants have breached their fiduciary duties to Oliver.

158.    As a direct result of these breaches of fiduciary duty, Oliver suffered substantial loss, the loss of receiving his benefit in the form of a lump sum.

159.    Had the Sonoco Defendants and Alight discharged their fiduciary monitoring duties prudently as described above, Oliver would not have suffered this loss.

160.    Oliver respectfully requests this Court enter an Order enjoining Defendants from denying its obligations under the Plan, and even though the Plan may have terminated, require the Defendants to take all actions to comply with its fiduciary duties and obligations under the Plan, including, but not limited to, creating a constructive trust or paying by restitution or other equitable measure Oliver's pension benefit in the form of a lump sum from whatever resources they have at their disposal in the amount of $716,366.13, plus prejudgment interest, attorney's fees, costs and expenses.

## CLAIM 3: NEGLIGENT MISREPRESENTATION

161.    Oliver repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

162.    Defendants made false representations and omissions to Oliver, specifically that Oliver's lump sum election would be processed and paid as soon as any issue with the draft QDRO was resolved.

163.    In fact, however, at least from Defendants' perspective, there was a limited time in which Oliver and Eckel would be able to correct any "restriction" the draft QDRO had placed on Oliver's lump sum election, and Defendants failed to communicate this information to Plaintiffs.

164.    Defendants had a pecuniary interest in ultimately cancelling Oliver's lump sum election.

165.    Defendants owed a duty of care to Oliver to act with the exclusive and sole purpose to protect Plan Participants' benefits and provide complete, accurate, and truthful information regarding Oliver's benefits.

166.    Defendants breached this duty by failing to exercise due care in that the statements were materially false or in that they failed to disclose material information to Oliver.

167.    Oliver justifiably relied on these representations.

168.    Oliver has suffered injury as a result of his reliance on Defendants' representations in that Defendants now take the position that payment of Oliver's benefit in the form of a lump sum is no longer possible.

169.    As a result of Defendants' negligent misrepresentations, Plaintiff is entitled to all actual and consequential damages flowing from this breach, as well as costs, expenses, and other damages that may be determined during litigation to be associated with this cause of action.

## CLAIM 4: CONVERSION BY THE SONOCO DEFENDANTS

170.    Oliver repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

171.    Oliver had a vested interest in his pension benefit under the Plan, including that it be paid in the form of a lump sum.

172.    Defendants funded Oliver's lump sum benefit in the amount of $716,336.32, during the Plan's lump sum window opportunity.

173.    Defendants confirmed on multiple occasions that Oliver had successfully elected to have his benefit paid in the form of a lump sum, and that sum would be paid as soon as administratively possible.

174.    Defendants converted Oliver's lump sum benefit for their own use and to comply with their obligations to other third parties, without the permission of Oliver.

175.    When terminating the Plan, the Sonoco Defendants purchased for far less than paying Oliver his benefit in the form of a lump sum, a single life annuity for him, and took for its own financial advantage any assets left in the Plan after purchasing group annuity contracts for Plan participants who elected to receive their benefit in the form of a lump sum or made no election at all and Oliver.

176.    Oliver made demand on the Sonoco Defendants for payment of his pension benefit in the form of a lump sum.

177.    The Sonoco Defendants' conversion of Oliver's lump sum for its own benefit has caused damage to Oliver who was otherwise entitled to $716,366.13, a portion of that to be paid to Eckel, beginning in May 2021, plus prejudgment interest, attorney's fees, costs and expenses.

178.    Oliver therefore believes that the Sonoco Defendants are liable to Oliver for the full value of the converted property at the time of conversion, together with pre-judgment interest thereon in an amount to be determined.

## CLAIM 5: EQUITABLE ESTOPPEL AGAINST THE SONOCO DEFENDANTS AND ALIGHT

179.    Oliver repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

180.    Defendants made false representations to Oliver and conducted themselves in a manner that conveyed the impression that the facts are otherwise than, and inconsistent with, those which Defendants subsequently attempted to assert.

181.    That is, Defendants confirmed that Oliver had successfully elected to receive his benefit in the form of a lump sum and would be paid that sum as soon as administratively possible.

182.    However, after Defendants cancelled Oliver's lump sum election and purchased an annuity for him instead, without notice to him of their conduct, Defendants later took the position that Oliver and Eckel had a limited time to act.

183.    Defendants had a duty to act for the exclusive and sole purpose of providing Oliver's pension benefit in the form of a lump sum.

184.    Defendants had actual or constructive knowledge of the alleged facts.

185.    Oliver lacked knowledge, and the means of knowledge, of the truth as to the facts in question.

186.    Oliver affirmatively inquired about the real facts, moreover, and Defendants failed to provide them in derogation of their fiduciary duties.

187.    Oliver reasonably relied upon the conduct of Defendants.

188.    In reliance on Defendants' conduct, Oliver has been prejudiced in that Defendants take the position that Oliver can no longer received his pension benefit in the form of a lump sum.

189.    Oliver therefore seek this Court to order Defendants to pay Oliver's pension benefit in the lump sum amount of $716,366.13, plus prejudgment interest, attorney's fees, costs and expenses.

**PRAYER FOR RELIEF**

For these reasons, Oliver respectfully requests that the Court:

- declare that Defendants have failed to provide Oliver with his pension benefit in the form of a lump sum as provided under the Plan or pursuant to Oliver's common law claims, and award Plaintiffs the sum of $716,366.13;

- breached their fiduciary duties as described above;

- award to the Plaintiffs their attorney's fees and costs under 29 U.S.C. §1132(g)(1);

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

Respectfully submitted,

ROBINSON GRAY STEPP & LAFFITTE, LLC


By: _s/ Beth B. Richardson_____
      Beth B. Richardson, Fed. ID No. 9335
      Benjamin R. Gooding, Fed ID No. 11897
      Jasmine D. Smith, Fed ID No. 12887
      PO Box 11449
      Columbia, SC 29211
      Telephone: (803) 231-7819
      brichardson@robinsongray.com
      bgooding@robinsongray.com
      jsmith@robinsongray.com

*Counsel for Plaintiff*

Columbia, South Carolina
June 30, 2022